UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:21-cr-273 (TFH) |
| v. | : | |
| | : | |
| STEPHEN MAURY BAKER, | : | 40 U.S.C. § 5104(e)(2)(G) |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Steven Maury Baker ("Baker") to 30 days of incarceration and $500 restitution.[1]

**I.      Introduction**

The defendant, Steven Maury Baker, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[2]

---

[1] A period of probation after a term of incarceration would be appropriate in the defendant's case. The general prohibition against sentences that combine continuous incarceration and a term of probation, see 18 U.S.C. § 3551(b), does not apply where, as here, the defendant is sentenced for a petty offense, see 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009).

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On February 7, 2022, Baker pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a period of incarceration is appropriate in this case because: (1) the defendant chose to enter the Capitol Building after seeing the eastern Rotunda doors breached twice; (2) the defendant remained inside the Capitol building for an hour; and (3) the defendant chose to remain despite watching police police attempt to expel rioters from the building.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that succeeded in halting the Congressional certification, combined with the defendant's observation of breaches of the Capitol building, and of rioters resisting police efforts to restore order, suggest that a sentence of incarceration is necessary and appropriate in this case.

## II. Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 29 (Statement of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Baker's Role in the January 6, 2021 Attack on the Capitol

On or before January 6, 2021, the defendant traveled from his home in Garner, North Carolina to Washington, D.C. to attend the former president's rally. The defendant had previously

lived in Washington, D.C. in the past and was familiar with the area. At the time, the defendant was a music teacher and also a live streamer: he broadcast a show through YouTube and other social media sites. It appears the defendant was an aspiring right-wing media personality, and that he planned to broadcast whatever happened on January 6, 2021. On the morning of January 6, the defendant recorded himself walking around the empty streets of D.C., warming up his voice (Exhibit 1) and greeting the few people who had signed on to his channel in advance of the day's events. (Exhibit 2.)[3]

By at least 2:20 p.m., the defendant stood on the landing, outside the eastern Rotunda doors, on the East Side of the Capitol.[4] The defendant had been recording footage of the riot on his cell phone and was broadcasting it live. His camera remained focused on those doors, and he captured the first breach of those doors at about 2:24 p.m. (Exhibit 3), as well as the second breach of those doors at about 2:38 p.m. (Exhibit 6.)

Inside those doors, at about 2:24 p.m., a rioter approached the eastern Rotunda doors and used his shoulder to force them open. (Exhibit 4.) A single person[5] tried to stop the rioters from entering, but he was overwhelmed by other rioters inside the building and forced away from the door. *Id.* After rioters inside forced the door open—a feat made more difficult due to the size of the crowd outside—they pulled a police officer through the door, then worked to clear a logjam of bodies outside. *Id.* Moments later, rioters outside began to pour into the Capitol building. *Id.*

---

[3] All exhibits cited herein are video files which have been shared with the Court and defense counsel through USAfx. Most are excerpted from the defendant's recordings. Two of the exhibits (Exhibits 4 and 5) are from U.S. Capitol Police surveillance footage.
[4] The government obtained the defendant's streaming footage through another YouTube channel that re-broadcast the defendant's feed. This other channel cut to the defendant's feed about four minutes before the eastern Rotunda doors were first forced open by rioters; by that point, he was on the landing, filming the door. The government lacks further information about when he arrived.
[5] This person appeared not to be law enforcement: he was wearing a suit, not a police uniform.

Outside, as captured by the defendant's cell phone, the crowd cheered enthusiastically when they saw the door had been forced open. As rioters in front of the door poured in, other members of the crowd moved closer to the front. The defendant moved with them. He waited as the door closed, continuing to film it until rioters forced it open again (Exhibit 3.)

Inside the Capitol, after several minutes of struggle with rioters, officers managed to close the eastern Rotunda doors. They moved three metal benches, which were positioned nearby, into position to block the doors. At 2:36, a pair of rioters cleared those metal benches, then sought to open the eastern Rotunda doors back up. (Exhibit 5.) They were stopped by police officers, but then by 2:38, those officers were overwhelmed by the crowd and the doors were forced open again. *Id.*

Outside, immediately before the breach, the crowd chanted "Whose house? Our house!" and "Who's your president? Trump!" (Exhibit 6.) As with the first breach, the crowd cheered as the doors were forced open. *Id.* As the defendant walked forward, he told the people watching his stream "Thanks for coming, everyone. I will never forget this." *Id.* Rioters advanced to screams of "Forward!" "Take our country back!" and "Don't let them [the police] close it [the door]!" *Id.* Several minutes later, the defendant entered through the eastern Rotunda doors, all the while broadcasting footage using his cell phone. *Id.* As he entered, the defendant's camera recorded—and he would have seen—shattered glass in the windowpanes of the eastern Rotunda doors, damage inflicted during the rioters' attempts to force them open. *Id.* His camera recorded—and he would have heard—the sound of an alarm, triggered when rioters forced open the eastern Rotunda doors. *Id.* That alarm remained steady, and piercingly loud, even over the crowd noise. *Id.*

As the Court knows, many rioters spoke about the Vice President, and members of congress, with violent rhetoric, and the defendant would have heard this during his time in the

4

Capitol. His camera fully captures the noise of the crowd and, from time to time, clearly captures discussions of violence. About four minutes after his entry, the defendant recorded other rioters talking about breaking into parts of the Capitol. (Exhibit 7.) About five minutes after that, he recorded a woman comment "I still wanted a couple strands of [Speaker] Pelosi's hair," and a man replied, "Fuck, I want her head, not just her hair." (Exhibit 8.) The defendant acknowledged the noise and the chaos, telling his crowd "Most of the streams I do are calmer than this, guys, if you ever want to stop by." (Exhibit 9.)

> Later, the defendant appeared to revel in the chaos, saying:
>
> Dude, this is such a hilarious scene. There's people like cuddling, and grifting, in gear. There's real people, there's LARPers,[6] there's streamers, there's Oath Keepers, there's cops not giving a shit. This is madness. And I – dude, there's no one within six feet of me dude, I'm just streaming. This shit is crazy in the nation's Capitol. There's old people – dude, boomers activated. Boomers and Gen X activated.

(Exhibit 10.) Earlier, the defendant had tried to move forward into the Rotunda itself but found that his live stream dropped when he did so (Exhibit 11.) So instead, he remained in the antechamber between the doors and the rotunda for about an hour, filming the crowd. A few minutes after 3:00 p.m., a detachment of Metropolitan Police Department officers arrived in the Rotunda, from the west side, and began to take control of the Rotunda, forcing rioters to the east side and eventually out. The defendant would have seen this. At one point, looking at a staircase and landing above him, the defendant remarked that he could not go upstairs because of police with guns. (Exhibit 12.) Then, about 22 minutes after his entry—so, shortly after 3:00 p.m.—the

---

[6] LARP stands for Live Action Role-Playing. It is a term commonly used to refer to people physically portraying characters within a role-playing game, which often (but not always) takes place in a fantasy setting. Of course, there were no pretend wizards at the Capitol building on January 6, 2021. Instead, it appears that the defendant was delighting in the sight of other rioters dressed in military-style gear.

defendant said to his audience "There's nowhere to go but out. The cops are forcing us out." (Exhibit 13.) The defendant's comments show he was aware of the police efforts. but nonetheless, he remained in the building, just outside the Rotunda. About six minutes later, he remarked "This is chaos. No leadership. At least I'm good at running a stream, right?" (Exhibit 14.)

The defendant's camera captured parts of the crowd getting pushed out of the eastern Rotunda doors as the police took control of the Rotunda and moved into the antechamber. Then, it captured what appeared to be a shoving match between police and rioters in this antechamber. Rioters raised their middle fingers at police, and some shouted "Traitors" and "you're dead to me." Eventually, the crowd started chanting "Shame on you" at the police. (Exhibit 15.) Eventually, the defendant acknowledged "we're getting forced out of here by the cops" (Exhibit 16) and "I'm one of the last people left in here" (Exhibit 17.) As the defendant left the Capitol building, his camera recorded chants of "Hang Mike Pence" within the crowd. *Id.*

*The Charges and Plea Agreement*

On January 27, 2021, Baker was charged by complaint with violating 18 U.S.C. § 1752(a)(1), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On February 1, 2021, he was arrested at his home in Garner, North Carolina. On February 23, 2021, Baker was charged by a three-count information with the same offenses. On February 7, 2022, he pleaded guilty to Count Three of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, Baker agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months

of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

IV. **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the balance of the Section 3553(a) factors favor incarceration.

A. **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have

observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.

Here, the defendant watched the Capitol building breached—twice—before he entered. He remained inside for nearly an hour, despite obvious signs of the breach, and resisted efforts from law enforcement to clear the building. The defendant did not resist by force, rather, he slid to the side of the antechamber near the Rotunda, standing out of the way of police, remaining until they successfully ejected the other rioters from the building. But the defendant did this while watching,

and with full awareness of, police efforts to clear the building. By his own efforts, and admission, he was one of the last people forced to leave the antechamber outside the Rotunda.

The defendant did not travel within the Capitol building; it appeared he was interested in maintaining his streaming video. Also, although the defendant witnessed conflicts between law enforcement and his fellow rioters, he did not appear to encourage violence.

Accordingly, this factor weighs in favor of incarceration.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, the defendant's criminal history consists of a conviction for being a minor in possession of alcohol in 2006 and being in possession of marijuana in 2007. (PSR ¶¶ 29-30.) These convictions appear to have occurred while the defendant was 18 and 19 years old, respectively. *Id.* Notably, after conviction in each of these cases, the defendant was accused of probation violations, failed to appear, and was brought back to court on a bench warrant. *Id.* His probation was then revoked.

The defendant has no subsequent criminal history. Here, he has been compliant with his pretrial release conditions. *Id.* ¶ 12.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[7] As with the nature and circumstances of the offense, this factor supports a

---

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that

10

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government acknowledges that the Defendant accepted responsibility by entering into this plea agreement. As of the date of this filing, the defendant has not expressed remorse. When interviewed by the Presentence Report Writer (PSR ¶ 24), the defendant "did not make any comments regarding the events of January 6, 2021, or his role." He had the opportunity to reflect on his participation and acknowledge the dangers and violence on January 6, 2021, and he did not.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[8] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[9] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more

---

[8] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[9] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Three of the Information, charging him with parading, demonstrating, and picketing within a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the cases of *United States v. Mark Simon*, 1:21-cr-00067 (ABJ), *United States v. Michael Lee Hardin*, 1:21-cr-00280 (TJK), and *United States v. Bennett*, 1:21-cr-227 (JEB). In *Simon*, the government sought a sentence of 45 days of incarceration; the *Simon* Court imposed a sentence of 35 days. In Hardin, the government sought a sentence of 45 days of incarceration; the *Hardin* Court imposed a sentence of 18 months of probation. In *Bennett*, the government sought a sentence of three years of probation with three months of home detention; the *Bennett* Court imposed a sentence of two years of probation with three months of home detention.

Simon, like this defendant, entered the Capitol building through the eastern Rotunda doors (1:21-cr-00067 ECF No. 32 at 2-3.) Simon saw law enforcement officers attempting to remove people from the Capitol building, just as this defendant did; he would have seen broken glass windows and heard an alarm, just as this defendant did. *Id.* at 3-4, 9. Simon has a criminal history this defendant lacks, *id.* at 10, but this defendant remained in the Capitol for longer, and demonstrated awareness—for approximately one hour—that police were trying to clear the building.

Hardin entered the Capitol through another entry, the Senate Wing Doors (1:21-cr-00280 ECF No. 35 at 3.) There the doors and windows were broken open by other rioters, which allowed Hardin to enter, *id.*; the same is true of this defendant. Hardin eventually made his way to the

15

Rotunda and, from the inside, watched other rioters assault law enforcement and breach the eastern Rotunda doors a second time. *Id.* at 5-7. Inside, Hardin cheered the breach, just as the defendant recorded other rioters cheering outside. *Id.* at 6. Hardin made his way deeper into the building, including to the Senate Gallery. *Id.* at 9-11. Hardin remained in the building for a total of 28 minutes, *id.* at 11, about half as long as this defendant.

Bennett, like this defendant, livestreamed his time on the Capitol grounds and in the Capitol building. He recorded other rioters taunting police and exhorting other rioters to resist police (1:21-cr-227 ECF No. 24 at 3.) But he was present in the Capitol for approximately 29 minutes, about half as much time as this defendant. At times, Bennett joined other rioters in their chanting; at other times, he admonished other rioters not to fight with officers. *Id.* at 3-4. This, too, is unlike this defendant, who watched conflict between other rioters and police, but never sought to de-escalate it.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Baker to 30 days of incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: */s/ Michael J. Romano*
MICHAEL J. ROMANO
IL Bar No. 6293658
Trial Attorney, Criminal Division
Detailed to the U.S. Attorney's Office
for the District of Columbia
601 D Street, N.W., Room 5.1510
Washington, D.C. 20530
Office: 202-252-7154
Michael.Romano2@usdoj.gov